

OR#05-1677-CBS

## AFFIDAVIT OF SPECIAL AGENT DEREK M. DUNN

I, Derek M. Dunn, being duly sworn, hereby depose and state as follows:

### INTRODUCTION

1. I am a Special Agent with United States Immigration and Customs Enforcement ("ICE"), and have been so employed since April 2003. Prior to becoming a Special Agent with ICE, I worked with the United States Customs Service as a Regulatory Auditor for seven years and nine months. I am currently assigned to the New England High Intensity Drug Trafficking Area Financial Task Force. Since April 2003, I have conducted and assisted in several money laundering and drug trafficking investigations. I have received specific training regarding these crimes during my tenure as a Special Agent.

2. I am submitting this affidavit in support of a criminal complaint charging Margarita Rosa Celorio ("Celorio"), with knowingly structuring a financial transaction to evade federal reporting requirements, in violation of 31 U.S.C. § 5324. For the reasons set forth hereinafter, I submit there is probable cause to believe Celorio has committed the said violations in the District of Massachusetts.

3. I have included in this affidavit only those facts that I believe establish the requisite probable cause for the issuance of the requested complaint. These facts are either personally known to me, or have been related to me by other federal, state, or local law enforcement officers or employees. The information contained in the Affidavit is submitted for the sole purpose of supplying probable cause for the issuance of the requested complaint. Accordingly, this Affidavit does not contain all of the information known to me regarding this criminal investigation.

AFFIDAVIT OF SPECIAL AGENT DEREK M. DUNN

I, Derek M. Dunn, being duly sworn, hereby depose and state as follows:

INTRODUCTION

1. I am a Special Agent with United States Immigration and Customs Enforcement ("ICE"), and have been so employed since April 2003. Prior to becoming a Special Agent with ICE, I worked with the United States Customs Service as a Regulatory Auditor for seven years and nine months. I am currently assigned to the New England High Intensity Drug Trafficking Area Financial Task Force. Since April 2003, I have conducted and assisted in several money laundering and drug trafficking investigations. I have received specific training regarding these crimes during my tenure as a Special Agent.

2. I am submitting this affidavit in support of a criminal complaint charging Margarita Rosa Celorio ("Celorio"), with knowingly structuring a financial transaction to evade federal reporting requirements, in violation of 31 U.S.C. § 5324 and the regulations promulgated thereunder at 31 CFR 103.11. For the reasons set forth hereinafter, I submit there is probable cause to believe Celorio has committed the said violations in the District of Massachusetts.

3. I have included in this affidavit only those facts that I believe establish the requisite probable cause for the issuance of the requested complaint. These facts are either personally known to me, or have been related to me by other federal, state, or local law enforcement officers or employees. The information contained in the Affidavit is submitted for the sole purpose of supplying probable cause for the issuance of the requested complaint. Accordingly, this Affidavit does not contain all of the information known to me regarding this criminal investigation.

## FACTS AND CIRCUMSTANCES

### Structuring of Wire Transfers

4. On July 17, 2004, a previously-reliable cooperating witness (the "CW") met with Celorio in Maverick Square Communications, 9 Maverick Square, Boston, Massachusetts ("Target Premises"), in connection with an ongoing ICE investigation of money laundering. Prior to the meeting, the CW was provided with a digital recording device and a transmitting device. The meeting was recorded and surveilled.

5. During this meeting, the CW informed Celorio that he/she had been referred to her by Amaro Millan ("Millan") as being able to assist him/her in wiring a large quantity of funds to Colombia. The CW explained that he/she had names of people who could receive money in Colombia though he/she had not created local names and addresses for the senders of the money. Celorio told the CW to get names of people the CW knew. The CW had previously met with Millan on multiple occasions and had provided Millan with funds represented to be drug proceeds so that Millan could wire the money to Colombia through his money remitting business.

6. Celorio stated that she was afraid to get involved in this. She received several offers, the latest involving real estate proceeds, requesting she wire funds to Colombia. Some of her friends had recently moved back to Colombia, sold their property here, and needed her assistance in wiring the money. She did not want to get involved.

7. Celorio said that Millan had called her but that he had not explained the situation fully. She further stated Millan knew the problem she had and that was why he referred the CW to her. Millan had told her he would send a friend that could help her out. Celorio did not expound further on the problem.

8. Celorio explained that the CW could send a small quantity of funds per week. The CW explained the funds the CW had to wire were of much larger quantities. The CW had come because

2

Millan had referred the CW to her. Celorio stated this was the first time she ever made wires of this type. The CW explained that the CW was looking to see how much could be wired on a weekly basis. The CW asked her to think about it. Celorio said she would think about it and call Millan with a fixed quantity she would wire per week to Colombia. Celorio stated she did not want any extra commission for the services.

9. On July 20, 2004, the CW met with Millan at Millan's business in Brockton. The meeting was consensually recorded. During this meeting, Millan stated Celorio was surprised when the CW told her there was $60,000 to be wired per week, and that she told Millan she could start with $10,000 per week. Millan further stated that Celorio told Millan she never wired this type of money for anyone before but would do it because she knew Millan and respected him, and Celorio warned Millan to be wary of people like the CW, implying the CW worked for the government. Millan said he assured her he knew the CW for several years. The CW explained he/she had told Celorio to do only what she felt was appropriate. The CW also had told her the money did not belong to him/her.

10. On July 23, 2004, the CW met with Millan. Prior to the meeting, the CW was provided with a digital recording device and a transmitting device. The meeting was recorded and monitored. During this meeting, Millan told the CW to take some money to Celorio to be wired. Millan told the CW to tell her it was his/her money in order to avoid any complications.

11. On August 5, 2004, the CW met with Millan. Prior to the meeting, the CW was provided with a digital recording device and a transmitting device. The meeting was recorded and monitored. The recording of the meeting was listened to and the CW was debriefed regarding the meeting. During this meeting, Millan told the CW to take some money to Celorio. The CW stated that he/she would be providing her with $10,000 to be wired to Colombia. Millan called Celorio to advise her that the CW would be taking her money the following day.

12. On August 6, 2004, the CW met with Millan in a consensually recorded meeting. Millan stated that Celorio was scared because she heard from someone "that a couple in another place was doing the same thing and (they) already have several people." The CW believed Celorio was again implying that the CW was working for the government. Millan said he told Celorio he had known the CW for a long time and did not think the CW would do that to him. Millan added Celorio was expecting the CW the following morning.

13. On August 6, 2004, the CW met with Celorio in a consensually recorded meeting at the Target Premises. During this meeting, Celorio accepted from the CW $10,000 in funds to be wired to Colombia and $400 in corresponding fees. Celorio wired the amount as follows:

| | |
|---|---|
| 08/09/04 | $1,000 |
| 08/09/04 | $ 961.54 |
| 08/13/04 | $1,000 |
| 08/14/04 | $1,200 |
| 08/14/04 | $ 800 |
| 08/17/04 | $ 800 |
| 08/17/04 | $ 700 |
| 08/17/04 | $1,400 |
| 08/19/04 | $ 900 |
| 08/19/04 | $ 600 |

The remaining $638.46 was included among the next wire transfers.

14. On August 13, 2004, the CW met with Celorio in a consensually recorded meeting at the Target Premises. During this meeting, Celorio accepted from the CW $10,000 in funds to be wired to Colombia and $400 in corresponding fees. Celorio wired the amount as follows:

| | |
|---|---|
| 08/20/04 | $ 700 |
| 08/25/04 | $1,442.31 |
| 08/25/04 | $ 800 |
| 08/26/04 | $1,200 |
| 08/27/04 | $1,000 |
| 08/27/04 | $1,200 |
| 08/28/04 | $1,449 |
| 08/30/04 | $1,000 |
| 09/03/04 | $1,000 |

The remaining $158.69 was included among the next wire transfers.

4

15. At the meeting on August 13, Celorio told the CW "they" check the quantity the business wires to look for any suspicious transactions, and that she was the owner of the business. The CW told Celorio to wire the funds only if she felt comfortable and secure doing so. Celorio told the CW she would help because Millan had recommended the CW. Celorio said she was going through a rough time while dealing with some problems. The CW once again reiterated that Celorio only wire the funds if she felt comfortable. Celorio said she could not guarantee when she would have the funds wired but promised to wire whenever she had a chance.

16. On August 24, 2004, the CW met with Millan. During this meeting, Millan told the CW if Celorio did not want to wire the funds, the CW should retrieve his/her money from her. The CW was to tell her not to continue doing the wires if she did not want to. The CW should bring any money to Millan and he would wire it for him/her.

17. On August 24, 2004, the CW met with Celorio in the Target Premises. During this consensually recorded meeting, Celorio stated she wanted to first finish the wires she had remaining when asked by the CW if she wanted more money to be brought in.

18. On September 1, 2004, the CW met with Millan in a consensually recorded meeting. During this meeting, Millan stated he spoke to Celorio. Celorio indicated she had two remaining wires to submit and would reuse two addresses from a previous list of names. Celorio once again stated she did not trust the CW and believed he/she was working with the government.

19. On September 1, 2004, the CW met with Celorio in the Target Premises, again consensually recorded. During this meeting, Celorio asked the CW to come back on Friday with less money to be wired and a new list of names.

20. On September 3, 2004, the CW met with Celorio in the Target Premises. During this consensually recorded meeting, Celorio accepted $10,000 in funds to be wired to Colombia and $400 in corresponding fees. Celorio wired the amount as follows:

5

```
09/07/04    $1,200
09/07/04    $1,000
09/07/04    $ 800
09/09/04    $1,200
09/09/04    $ 900
09/21/04    $ 644.23
09/21/04    $1,000
09/23/04    $1,000
09/23/04    $1,442.31
09/23/04    $1,499
```

The remaining $111.61 was included among the next wire transfers.

21. On September 17, 2004, the CW met with Millan. During this meeting, which was consensually recorded, Millan stated he had spoken to Celorio and she expressed concern that at any moment someone would come in and look at her wire transfers. She again said the CW might be working for the government. According to Millan, Celorio stated she had never charged for her services and was too embarrassed to ask the CW for anything. Millan suggested the CW give Celorio $1,000 as an extra commission for services rendered thus far.

22. On September 17, 2004, the CW met with Celorio in the Target Premises. During this meeting, which was consensually recorded, Celorio stated she was only given three lists of names to use to wire money and she had several names remaining from the last two lists.

23. On September 22, 2004, the CW met with Celorio in the Target Premises. During this meeting, Celorio accepted $10,000 in funds to be wired to Colombia and $400 in corresponding fees. Celorio wired the amount as follows:

```
09/24/04    $1,300
09/25/04    $ 559
09/25/04    $1,000
09/25/04    $1,200
```

Of the remaining $6,052.61, Celorio returned $5,020 on December 2, 2004. The remaining $1,032.61 were neither wired nor returned to the CW by Celorio.

25. During this meeting, Celorio asked the CW to ensure the recipients in Colombia receive this money promptly. Celorio indicated one of the wires had not gone through. Celorio told the CW to be sure to call the people in Colombia so they would be ready to receive the funds. If the funds are not picked up, the funds are returned to the remitting company who in turn contacts Celorio.

26. The CW reiterated the importance of getting this money down to Colombia. The CW said the money was serious and he did not want to upset the people receiving it. Celorio said she would keep the old list of names yet still use names from the new list the CW delivered today. Celorio stated she would send 3 wire transfers of $1,000 each that day.

27. On November 6, 2004, the CW met with Celorio in the Target Premises. Prior to the meeting, the CW was provided with a digital recording device and a transmitting device. The meeting was recorded and monitored.

28. During this meeting, Celorio stated she had borrowed the unwired funds to pay debts she had accumulated. She had taken the funds expecting to receive a loan within those days. Unfortunately, the loan never occurred. The CW said they had to resolve this now. The people in Colombia grew more upset when he suggested giving her more money to be wired. The CW reminded Celorio the money was not the CW's. The CW was accountable and not her. They would come after the CW. Their money was everything. The Colombians had gotten upset when they found out she had taken the money. The CW asked Celorio how she was going to handle this. The CW asked for some type of repayment plan. Celorio said she knew the CW had been patient. However, things just had not turned out as she had expected. The CW reiterated he/she was in danger because of this money. Celorio said she understood the CW's position because "I've seen that a lot of that...a lot of that."

29. The CW said the people in Colombia were upset. The CW said the danger was for the CW not for her. She responded the danger was for her because since she started sending wire transfers for the CW she noticed something was not right. She said she did not know what was going on with the CW's orders. All of the CW's orders were never confirmed. Her other orders usually appeared "Paid" and "Confirmed" within 3-4 days. If people were picking the CW's money up in Colombia, their orders were not appearing "Paid" or "Confirmed" in the system. Celorio said she had told Millan none of the CW's orders were getting confirmed. She had asked Millan if he noticed where the CW's money was going. She told him if the remitting company was to follow where the CW's money was going, they would all go down. Millan said he had known the CW for a long time now and was not worried. She said she did not know the CW for a long time and did not understand this. Celorio told the CW she does check what goes on in her computer.

30. The CW asked why she had not called to inquire why this was happening. She said Millan also had told her to call. She said she had not called the remitting company because they would begin to interrogate her on the orders.

31. Celorio told the CW they could not repeat the names because even though they were separate locations, both she and Millan ultimately sent their wires through the same company. She said one of the recipient names sounded familiar to her.

32. Celorio said she would talk to Millan on Monday to see if he could help her with at least half the money. She said she would have him pay it directly to the CW. The CW suggested she could give him half the money on Monday and the other part on Saturday. Celorio said she had made the business work over many years but she had to sell it now. Celorio told the CW she could not officially transfer ownership of the business. Her name had to remain on the business. The owner would not let her change the name. She said she could trust Millan but if something bad were to happen, she would be the one getting in trouble because her name was on the business.

33. Celorio said this had been the first time she did this. Millan had told her this was something serious. He had told her he was sending an Ecuadorian client who sends large quantities of money a month. He said it was a good client. Celorio said she told him she never did this.

34. On November 9, 2004, the CW met with Celorio in the Target Premises. Prior to the meeting, the CW was provided with a digital recording device and a transmitting device. The meeting was recorded and monitored.

35. During this meeting, Celorio called and asked Millan if he would lend her money. It is believed Millan responded no. Celorio then asked Millan if he would reconsider if she sold him the business. They agreed to meet the following morning at Millan's store. Celorio asked the CW to also attend this meeting. The CW told her it was their business and the CW did not have to be present. Celorio once again asked the CW to attend. The CW agreed.

36. On November 20, 2004, the CW met with Celorio in the Target Premises. Prior to the meeting, the CW was provided with a digital recording device and a transmitting device. The meeting was recorded and monitored.

37. During this meeting, Celorio stated she had not resolved anything yet. However, next week she would be receiving money. At the end of the month, she would personally deliver the money to Millan. Celorio stated she would personally travel down to Millan's store so there would be no need for the CW to come to her office.

38. The CW asked if she had peace of mind. Celorio said yes. The CW reiterated it was not the CW's intention to make her feel threatened or uncomfortable. Celorio said she looked bad with everyone. She said that back then, it never crossed her mind that she would not be lent that money. The CW believed she referred to the loan she was supposed to receive.

9

39. On December 2, 2004, the CW met with Celorio in the Target Premises. Prior to the meeting, the CW was provided with a digital recording device and a transmitting device. The meeting was recorded and monitored.

40. During this meeting, Celorio returned $5,020 in funds not wired to Colombia. She asked the CW to call her during the week to confirm if she had additional money to finish repaying the outstanding funds not yet wired.

41. On January 8, 2005, the CW called Celorio at the Target Premises. The CW asked Celorio if she had the remaining money. Celorio stated business had been slow and asked the CW to come that following Friday. The CW was unable to record this telephone call.

## CONCLUSION

42. Based upon the above information, and my own training and experience in this case, I believe that there is probably cause to believe that Margarita Rosa Celorio has committed in the District of Massachusetts the offenses of knowingly structuring a financial transaction to evade federal reporting requirements, in violation of 31 U.S.C. § 5324 and the regulations promulgated thereunder, 31 CFR 103.11.

I declare that the foregoing is true and correct to the best of my knowledge and belief.

DEREK M. DUNN
Special Agent
United States Immigration and Customs Enforcement

Subscribed and sworn to
Before me this / 3 (*t*)_ day of
January, 2005

CHARLES B. SWARTWOOD III
CHIEF, UNITED STATES MAGISTRATE JUDGE

**Criminal Case Cover Sheet**          U.S. District Court - District of Massachusetts

**Place of Offense:** Suffolk     **Category No.** II     **Investigating Agency** ICE / IRS

**City** Boston     **Related Case Information:**

**County** Suffolk

Superseding Ind./Inf. _____  Case No. _____
Same Defendant _____  New Defendant  x
Magistrate Judge Case Number _____
Search Warrant Case Number _____
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name  Margarita Rosa Celorio     Juvenile  ☐ Yes  ☒ No

Alias Name _____

Address _____

Birth date (Year only): _____  SSN (last 4 #): _____  Sex  F  Race: Hispanic  Nationality: Colombian

Defense Counsel if known: _____  Address: _____

Bar Number: _____

**U.S. Attorney Information:**

AUSA  Nancy Rue     Bar Number if applicable _____

Interpreter:  ☒ Yes  ☐ No     List language and/or dialect: Spanish

Matter to be SEALED:  ☒ Yes  ☐ No

☒ Warrant Requested     ☐ Regular Process     ☐ In Custody

**Location Status:**

**Arrest Date:** _____

☐ Already in Federal Custody as _____ in _____
☐ Already in State Custody _____  ☐ Serving Sentence  ☐ Awaiting Trial
☐ On Pretrial Release: Ordered by _____ on _____

**Charging Document:**    ☒ Complaint    ☐ Information    ☐ Indictment

**Total # of Counts:**    ☐ Petty _____    ☐ Misdemeanor _____    ☐ Felony _____

Continue on Page 2 for Entry of U.S.C. Citations

☒ I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

Date: 1/13/05     **Signature of AUSA:** _(signed)_

District Court Case Number (To be filled in by deputy clerk): _____

Name of Defendant    Margarita Rosa Celorio

## U.S.C. Citations

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 31 USC 5324 | Structuring | |
| Set 2 | | | |
| Set 3 | | | |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:**